SHELLEY D. KROHN, ESQ.
Nevada Bar No. 5040
E-mail: shelley@krohnlawoffice.com
**SHELLEY D. KROHN, LTD.**
228 south 4th Street, #300
Las Vegas, Nevada 89101
Telephone: (702) 421-2210
Facsimile: (702) 366-1939
Counsel for Chapter 11 Trustee,
 Brian D. Shapiro

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re: | BK-S 11-11816-LBR |
| | Chapter 11 |
| EQUIPMENT MANAGEMENT TECHNOLOGY, | |
| | Date: August 11, 2011 |
| Debtor. | Time: 10:30 a.m. |

**CHAPTER 11 TRUSTEE'S RESPONSE TO GLOBAL TEST EQUIPMENT, INC.'S AND THE DEBTOR-OUT-OF-POSSESSION'S OPPOSITIONS TO MOTION FOR AN ORDER AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS TO ELECTRO RENT CORPORATION, *ET AL*.**

COMES NOW Brian D. Shapiro, Chapter 11 Trustee ("Trustee"), by and through the law firm of Shelley D. Krohn, Ltd., and files his *Response to Global Test Equipment, Inc.'s and the Debtor-out-of-possession's Oppositions to Motion for an Order Authorizing and Approving the Sale of Substantially All of the Debtor's Assets to Electro Rent Corporation*. This Response is based upon the pleadings and papers on file herein, the Declaration of Trustee, and the arguments of counsel at the hearing on this matter.

SHELLEY D. KROHN, LTD.

/s/ Shelley D. Krohn
_____
Shelley D. Krohn, Esq.
Nevada Bar No. 5040
228 South 4TH Street, #300
Las Vegas, Nevada 89101
Attorneys for Chapter 11 Trustee,
 Brian D. Shapiro

The Trustee was appointed in the present case after a motion was brought by FCC, LLC, d/b/a First Capital Western Region, LLC ("FCC") to appoint a trustee. FCC is fully secured in all of the Debtor's assets and income. The obligation owed to FCC by the Debtor is approximately $12,615,241.08. *See* Declaration of John Neher dated August 10, 2011. Since his appointment in March of 2011, the Trustee has continued to oversee and operate the Debtor. The Trustee marketed the Debtor for sale and entered to confidentiality agreements with several interested parties. After lengthy and intensive negotiations, the Trustee accepted a purchase offer from Electro Rent Corporation ("ERC") in the amount of $11,084,291.00 less potential adjustments not to exceed $500,000.00. Immediately upon acceptance of the offer by ERC, the Trustee notified all of the other interested parties that a tentative sale agreement had been entered into and that no further negotiations would be forthcoming.

Global Test Equipment, Inc. ("GTE") is owned by the daughter of Vito Longo, the sole shareholder and principal of the Debtor. At the March 11, 2011 hearing on FCC's request to appoint a Trustee, the Court expressed concern regarding the ability of Mr. Longo to market the Debtor for sale and broker a deal that was in the best interests of the creditors based on this familial relationship between Mr. Longo, the Debtor and GTE. *See* March 11, 2011 Transcript, page 30, lines 17-20, page 35, lines 12-14 attached hereto as Exhibit "A". Ultimately, the Court appointed the Trustee upon later agreements by the parties.

GTE's opposition focuses on largely two principles: (1) that

GTE's offer is more than the pending offer of ERC so it should prevail, and (2) that some sort of deference should be shown to GTE as there "is an emotional interest in preserving the assets of the Debtor through GTE." See GTE's Opposition [Docket No. 251], page 2, paragraph 3. The Trustee has concerns about both of these arguments.

First, the Trustee cannot let his business judgement be swayed by emotional interests of interested family members.  Clearly that is not appropriate and not in the best interests of creditors.  The Trustee has been in communication with GTE regarding a purchase of the Debtor just as he was in communications with other interested parties.  Unfortunately, GTE did not offer the highest and best purchase price.  The highest offer that GTE ever made to the Trustee was significantly less than the cash offer received from ERC.  Again, the Trustee's obligation is to creditors, not the family of the Debtor's principal.  Thus, it was impossible for the Trustee to accept GTE's offer.

Second, it is important to point out that GTE has been attempting to purchase the Debtor for months.  In fact, there was a sale of the Debtor to GTE that was supposed to close in January of 2010.  The deal never closed.  See Exhibit "A", March 11, 2011 Transcript, page 33, lines 2-6.  In fact, FCC's Omnibus Reply to GTE's Opposition sets forth in detail all of the many efforts that GTE has made to try and buy the Debtor.  All to no avail.

As early as March 20, 2011, communications were had between the Trustee and GTE's counsel, Elizabeth Bates, regarding a potential for sale of the Debtor to GTE.  See Declaration of

Trustee. These communications went back and forth between the parties for months until the Trustee received an email from Harris Bank ("Harris") dated July 6, 2011, indicating that the deal for $8 million was "dead". *See* Declaration of Trustee. For GTE to now claim that it was not given adequate opportunity to try and buy the Debtor is not only disingenuous, it appears to be purposely misleading. GTE has had months, if not years, to put a deal together. They simply were never able to close a deal.

On its face, it appears that GTE's offer of $12,200,000.00 is more than the current offer from ERC. GTE even states that this increase in purchase price will result in additional funds for administrative claims, and unsecured creditors. *See* GTE's Opposition [Docket No. 251], page 3 paragraph 5(a). This is simply untrue. Recall that FCC is secured to all assets of the Debtor. Unless and until an offer is made that exceeds the amount owed to FCC, there are NO MONIES available to administrative claims or unsecured claims UNLESS FCC agrees to that distribution. With the present offer from ERC, FCC has generously agreed to a carve out that will make distribution to administrative claimants and $300,000.00 to general unsecured claimants. There is absolutely no requirement that FCC would have to increase any distribution to administrative or unsecured claimants because the offer of GTE is still LESS than what is owed to FCC. The offer from GTE really nets no additional funds for other claimants of the Debtor. In that vein, the offers of GTE and ERC are the same.

Obviously under these facts, FCC has an uncontroverted position of oversight and approval of any proposed sale. Debtor's

counsel even acknowledges that any sale of the Debtor's business would clearly be subject to FCC's approval. *See* Exhibit "A", March 11, 2011 Transcript, page 34, lines 13-16. Based on FCC's pleadings in this case, the Trustee clearly has FCC's approval of the sale to ERC.

The Trustee has reviewed the competing offer of GTE. GTE proposes to pay the sum of $12,200,000.00 by obtaining a loan from Harris in the amount of $8.5 million and a second loan from US Capital Partners ("US Capital") in the amount of $3.7 million. GTE is not proposing to put up any of its own money. Rather, its offer requires 100% financing. While the $8.5 million loan from Harris appears to be a relatively firm commitment[1], it cannot be argued that the letter from US Capital shares that same status. Upon receiving the "commitment letters" of Harris and US Capital attached to GTE's pleadings, the Trustee obtained approval from GTE's counsel to contact said potential lenders.

US Capital made it very clear to the Trustee that there was no certainty that it would fund the $3.7 million loan to Mr. Longo[2] until their due diligence was completed. Further, US Capital would not even begin their due diligence investigation until a $35,000.00

---

[1] Trustee does not consider the letter of Harris dated August 10, 2011 a firm commitment letter. On its face, the letter states that Harris is merely "interested" in providing the funding. It does not commit to extend a $12.2 million loan. Harris states that it must complete more investigation. With the exception of the July 6, 2011 email from Harris stating that the deal was dead, Harris has never requested anything from the Trustee. Furthermore, the Trustee would not have provided any direct information to Harris as such information would have only been provided to GTE by virtue of a confidentiality agreement. *See* Declaration of Trustee.

[2] US Capital's commitment letter is addressed to Vito Longo as CEO of the Debtor. GTE is identified as a corporate guarantor.

-5-

retainer was paid. Upon receipt of the retainer, US Capital anticipated that the due diligence investigation of both the Debtor and GTE would take 10-14 days. If <u>any</u> loan was to be extended, US Capital believed it would be 4-6 weeks after that to fund the loan. *See* Declaration of Trustee. US Capital advised that no financial records of the Debtor or GTE had been provided. Rather the commitment letter was based purely on conversation with Mr. Longo and Amy Perry (sole shareholder of GTE and Mr. Longo's daughter). *See* Declaration of Trustee. Obviously, the Trustee has no idea of the contents of that conversation other than Mr. Longo and Ms. Perry most certainly made the ongoing business of the Debtor and GTE appear loan-worthy to the tune of $3.7 million. Whether their "puffery" will pan out in a $3.7 million loan once the actual financial documents are provided to US Capital is anybody's guess.

To summarize, the Trustee has received two offers to purchase the Debtor. The first is an immediate, all cash offer from ERC that will result in a carve out for administrative claimants and general unsecured creditors. FCC is agreeable to this offer despite the fact it will not be paid in full. The second offer is from GTE for a slightly larger amount. However, this offer will not result in any increase in the distribution to administrative and unsecured creditors. Rather, FCC will receive slightly more on this obligation but it still will not be paid in full. Regardless of the potential to collect more on its obligation, FCC is NOT agreeable to GTE's offer as it is completely dependent on financing that has yet to be secured by GTE. *See* FCC's Omnibus Reply.

The Trustee's position is clearly what is in the best

interests of ALL of the creditors of the Debtor. Plainly stated, the Trustee has one offer for cash and one offer that requires financing that has yet to secured. For all other purposes, the offers are the same as far as the Estate is concerned. The Trustee is legitimately concerned that if the sale to ERC is denied so the a sale with GTE can be pursued, the Estate will be irreparably harmed. ERC has made it clear that if this transaction does not close pursuant to the terms of the Purchase Agreement; i.e. closing must occur within three days after court approval, or August 15, 2011[3], that it will terminate the Asset Purchase Agreement.

The ability of the Debtor to return to operations if the sale is not approved is unlikely. The Trustee has had to terminate employees of the Debtor, including Vito Longo. Longo was permitting non-employees to have access to the Debtor's computers and financial information. Longo admitted his wrongdoing to the Trustee but refused to sign an acknowledgment of the same and agreement not to let it happen again. As a result, Longo was not allowed on the Debtor's property. It is also apparent that Longo has maintained communications with the lab techs and has made promises that he is going to "save" the business with a $17 million loan. See Declaration of Trustee. As such, the lab techs remain loyal to Longo even to the point of becoming confrontational with the Trustee. See Declaration of Trustee. When ERC visited the warehouse and lab during its due diligence investigation, the lab techs refused to cooperate and assist in the investigation despite the Trustee's direct instruction to the contrary. Even more

---

[3] See Asset Purchase Agreement, Article X.

concerning is that employees may have attempted to utilize portable hard drives ("thumb drives") to obtain information for Longo. It is unknown which employee was attempting to access the computer. However, after entering into the agreement with ERC, the lab technicians were removed from the premises. After such removal, it appears that such employees deleted any and all emails in their mail box (including sent email). Such removal appears to be intentional as it prevents any investigation into what they actually were sending to third parties. *See* Declaration of Trustee.

In addition to the insubordination, the lab techs have admitted to updating their resumes on the Debtor's computers. Computer logs also show that the employees have visited the Nevada unemployment website presumably to determine eligibility for benefits. *See* Declaration of Trustee.

The employee that handled the forklift and bidding process has already resigned leaving no one competent to handle those particular duties. Quite simply, there is no one left to perform necessary job duties. *See* Declaration of Trustee. While the CFO, Kristina Hedge, has agreed to stay on with the Debtor through this bankruptcy process, it would not be surprising if she accepted a position elsewhere. While Ms. Hedge has been both loyal to the Debtor and supportive of the Trustee's efforts, there can be no doubt that the end is coming. When Ms. Hedge finally leaves, there will be no one left to help the Trustee conduct the business of the Debtor.

The situation is dire. The ability of this Debtor to go back

-8-

to "business-as-usual" operations if the sale of the Debtor is not approved at this time, is remote. The sale of the Debtor at this point in time has taken on a "now or never" urgency. If there is no sale at this time, the value of the Debtor will be decreased significantly making any future offers substantially less than the current offers. As such, FCC will likely exercise its right to simply collect the Debtor's assets and call it a day.

As to the two offers that are up for consideration, the Trustee, in his best business judgment, has to support the cash offer from ERC. The offer from GTE is simply too tenuous and doesn't result in any increase in distribution to administrative or unsecured creditors. If the sale to ERC is lost and the funding does not come through for GTE/Vito Longo, this Debtor and its creditors will be irreparably harmed. It is extremely unlikely that the Trustee could secure another offer of this magnitude, especially since the Debtor will more than likely no longer be operating. More importantly, FCC will undoubtedly simply foreclose on its security interest and repossess all of the Debtor's assets and income. That leaves the Estate and all of its administrative and unsecured creditors with NOTHING. The risk is simply too great to ignore.

Alternatively, if the Court is inclined to provide additional time to GTE to purchase the assets, then they should be required to immediately deposit at least $6 to $7 million dollars as a nonrefundable deposit. Such nonrefundable deposit will provide the Estate with the ability to recover any damages by virtue of a lost sale to ERC.

WHEREFORE, the Trustee respectfully requests this Court approve the sale to ERC as set forth in his *Motion for an Order Authorizing and Approving the Sale of Substantially All of the Debtor's Assets to Electro Rent Corporation* and for any other relief this Court deems just and equitable.

Dated this 10th day of August, 2011.

SHELLEY D. KROHN, LTD.

*/s/ Shelley D. Krohn*

SHELLEY D. KROHN, ESQ.
Nevada Bar No. 5040
E-mail: shelley@krohnlawoffice.com
228 South 4th Street #300
Las Vegas, Nevada 89101
Telephone: (702) 421-2210
Facsimile: (702) 366-1939
Attorneys for Brian D. Shapiro,
 Chapter 11 Trustee

W:\Sdk\BK\1SHAPIRO\EMT 8000-2\response to GTE opp.wpd

**EXHIBIT "A"**

1

|   |   |   |
|---|---|---|
| 1 | UNITED STATES BANKRUPTCY COURT | |
| 2 | DISTRICT OF NEVADA | |
| 3 | LAS VEGAS, NEVADA | |
| 4 | In re:  EQUIPMENT MANAGEMENT TECHNOLOGY, | ) E-Filed:  08/01/11 |
| 5 | ) | |
| 6 | Debtor. | ) Case No.<br>) BK-S-11-11816-LBR |
| 7 | ) Chapter 11 | |

```
11              TRANSCRIPT OF PROCEEDINGS
                           OF
12                 HEARING RE: MOTIONS
                       VOLUME 1
13         BEFORE THE HONORABLE LINDA B. RIEGLE
              UNITED STATES BANKRUPTCY JUDGE
14
                  Friday, March 11, 2011
15
                        9:30 a.m.
```

23  Court Recorder:       Helen C. Smith

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

1       And this is sensitive equipment, your Honor.  You don't
2  want to be shipping one piece at a time.  It's expensive.
3       So there could be equipment that gets returned from one of
4  the vendors they're both working with, and I don't think it's a
5  material amount of equipment, your Honor, when you get there.
6       But some stuff could have been returned from Northrop to
7  EMT that a part of it belongs to Global in the transactions
8  they both do --
9            THE COURT:  But, apparently --
10           MR. SCHWARTZ:  -- with Northrop.
11           THE COURT:  -- all of sudden, your accounting says it
12  belongs to Global and not to the debtor.
13           MR. SCHWARTZ:  I think this is an issue that Global
14  raised with the equipment list that they're being offered that
15  they got from FCC and saying, wait a minute, some of that's our
16  equipment.  I haven't seen, your Honor, what this amount --
17           THE COURT:  Well --
18           MR. SCHWARTZ:  -- we're talking about.
19           THE COURT:  -- how can Mr. Longo be in a position to
20  assert the rights of the debtor on that issue?
21           MR. SCHWARTZ:  I think, your Honor, it's an
22  evidentiary issue.  I don't think we're asserting any rights or
23  not.
24           THE COURT:  Well --
25           MR. SCHWARTZ:  I don't --

1  happened.
2  　　　And everyone said we thought there was a sale that was
3  supposed to close on January 28th. That's in Mr. Nair's
4  declarations. Everybody thought this business was going to
5  sell to Global on the 28th of January. For whatever reason,
6  everybody's got their answers. It didn't close.
7  　　　In that context, I think, your Honor, there's one other
8  point there that is important that Mr. Gordon says, well, now
9  Global's not paying their bills to EMT because they thought the
10 sale was going on.
11 　　　Well, that's right, your Honor. I think there have been
12 various offers out there, one that peaked at about 11.2
13 million.
14 　　　I think I'd conceive from a buyer of a business regardless
15 of whether they're related or not you're buying your competitor
16 or your customer. I'm about to give you what's now 9.25
17 million or 11.25 million. That's our deal. I'm sorry that I'm
18 not about to pay you for this receivable that I owe you in the
19 context I'm about to close.
20 　　　So I think there's a little bit of misdirection there,
21 too, your Honor, in that you had a large transaction going on
22 in which all the parties were complicit and agreed, and now
23 we're talking about what is payables that could be only 30 or
24 60 days old, and, again, some (indiscernible) were saying
25 $170,000.

1   The receiver's numbers from last year, your Honor -- I'm
2   sorry -- the debtor did 9.5 million in total revenue.  So,
3   again, some of the things we're highlighting here, they're not
4   immaterial, your Honor, but they're not massive.
5       We're not talking about big numbers, and so I think
6   there's a little bit of misdirection and a little bit of
7   overstating.
8       So to go back to the top, I think it's clear and
9   convincing evidence for the appointment of a trustee.  I think
10  you have -- it's an extraordinary remedy.  I think in terms of
11  the risk going forward -- the sale process, if we break things
12  up, I think that's an interesting idea.
13  But we know where the equipment is.  We have a list.  The
14  books are balanced.  We've agreed all sales will be done at
15  this point with FCC's consent, so I don't see the risk to the
16  company at this point.
17      Finally, your Honor, in our reply, we put in at least two
18  declarations from customers who say they think working with
19  Mr. Longo is in the best interest of the company, so we have
20  customer support.
21      And so at this stage in the case absent something
22  postpetition that Mr. Longo does -- and all the cases say that
23  there's always a postpetition act that gives rise to the
24  appointment of a trustee in total -- it's just too early and
25  not appropriate.

```
 1        THE COURT:  Okay.  All right.  Before I ask for
 2   exhibits and before we start the testimony, I'm going to have
 3   you take 10, 15 minutes to discuss my thought on -- it is
 4   purely settlement, I mean, because the answer's going to be I'm
 5   either going to appoint a trustee or I'm not going to appoint a
 6   trustee.
 7        So now's your time before you spend a whole day on
 8   attorneys time, et cetera, and thinking about the idea is
 9   appointment of a trustee to conduct the sales process leaving
10   the debtor in possession to run the business or some variation
11   on that kind of theme.
12        I mean, you have various interests and stuff because we do
13   have a concern about operating a business, but the fiduciary
14   issues.
15        So let me just have you spend ten minutes talking about
16   it.  If you don't come to an agreement, that's fine.  We'll
17   take testimony.
18        MR. SCHWARTZ:  One question, your Honor.  We had
19   discussed earlier -- but it didn't seem to make sense at the
20   time -- maybe a chief restructuring officer or something of
21   that matter.
22        THE COURT:  That's --
23        MR. SCHWARTZ:  Would that --
24        THE COURT:  That's certainly within your discussions.
25        MR. SCHWARTZ:  Just make sure --
```